Opinion by JUDGE LOEB
¶ 1 Defendant, Jerry L. Chase, appeals the judgment of conviction entered on jury verdicts finding him guilty of three felony counts of stalking and three misdemeanor counts of harassment. He also appeals the sentences imposed. We affirm.
I. Background and Procedural History
¶ 2 From 2002 to 2008, Chase resided in Wapiti Meadows, a low-income housing complex in Grand County, Colorado, where he met the three named victims in this case: G.B., D.D., and M.G. G.B. lived at Wapiti Meadows and was its property manager at the time of the charged crimes; D.D. was its former property manager; and M.G. was the maintenance supervisor at the time. M.G. and D.D. were also husband and wife.
*745 ¶ 3 During his tenancy, Chase made frequent complaints to D.D., G.B., and M.G. regarding his next-door neighbors, the B. family. He complained about the family's ethnicity and alleged that they were purposefully making noise to disturb him. In September 2008, Mr. B. accused Chase of putting sugar in his gas tank. Chase was charged with criminal mischief, and the district court entered a restraining order against Chase.[1] Chase violated the order by banging on the B. family's wall and yelling an ethnically charged threat at them.
¶ 4 Based on these events, the Wapiti Meadows management evicted Chase on October 1, 2008. G.B. posted the eviction notice on his door. On October 2, 2008, Chase sent an e-mail to G.B. asking her how he could fight the eviction. He also indicated that he had gone to Boston for a time, which G.B. knew that he did every year. G.B. told Chase she could not offer him any legal advice.
¶ 5 On the evening of October 6, 2008, Chase sent an e-mail to twenty-three recipients, including G.B., M.G., and D.D. Chase was in Boston at the time. The e-mail was sent to G.B.'s work e-mail address and M.G.'s and D.D.'s personal e-mail addresses. It stated:
I am 60 years old. I did 14 years in Walpole, MA for arson. Do NOT FUCK WITH ME. REMOVE THE FUCKING EVICTION NOTICE YOU FUCKING ASSHOLES. YOU BETTER PUT ME AWAY FOR LIFE MOTHERFUCKERS, OR THERE WILL BE HELL TO PAY. THAT SOVIET ASSHOLE [referring to Mr. B.]. HOW DARE YOU!!!! REMOVE THAT FUCKING NOTICE NOW!!!!!!!!!!!
¶ 6 In the early morning of October 7, 2008, Chase sent a second e-mail to thirty-four recipients, including G.B., M.G., and D.D., the three of whom were specifically mentioned in the e-mail. He wrote, in pertinent part:
Kicking a 60 year-old man out of his apartment because of one Soviet immigrant? Fuck You!! THAT IS EVIL. YOU PIECES OF SHIT. That's a death sentence. ... "To those whom evil is done, do evil in return." I hate the womb that bore you assholes life!! DO EVIL TO ME WILL YOU? You pieces of shit-from that ugly-ass housing officer[ ], to those cunts [D.D.] and [G.B.], to Mr. "thinks he's a badass" [M.G.], I won't take a death sentence lying down ... PS: TAKE THE EVICTION NOTICE DOWN NOW.
¶ 7 Twenty-five minutes later, Chase sent the group a third e-mail, which included a photograph of a man pointing a gun at a judge. It demanded that the eviction notice be removed and stated:
SOMEONE'S GOING TO GET HURT, OR WORSE!!!!! DO YOU UNDERSTAND? SOMEONE IS GOING TO GET HURT. IT'LL PROBABLY BE ME-no it will be me-BUT WHAT HAVE I GOT TO LOSE? I WILL NOT GIVE UP MY APARTMENT WITHOUT A SERIOUS FIGHT.
Twenty-five minutes later, Chase sent a fourth e-mail to the group, again specifically referring to D.D. and G.B. and stating:
I've got NOTHING TO LOSE, YOU PIECES OF SHIT. I HATE THE LORD GOD FOR GIVING YOU LIFE!!!!!!!!! cc: CUNT-ASS [D.D.] CUNT-ASS [G.B.]
TAKE THE EVICTION NOTICE OFF MY DOOR Your [sic] playing a very, very , dangerous game of bluff with me.
Twenty minutes later, Chase sent the group a fifth e-mail criticizing the legal system, and then forty minutes later he sent them a sixth and final e-mail, stating:
Better check out my football pictures at [Chase's myspace.com address.] I will headbutt someone, and I can and will kick as you can see from my yoga pictures. Someone, I don't really know who-nor do I care-is playing a very dangerous game of bluff with me.
¶ 8 Although they lived in Grand County, M.G. and D.D. were in Baltimore, Maryland, visiting family when they opened and read *746 the six e-mails in one sitting on October 7. They intended to (and did) return to Colorado a few days later, and evidence at trial showed they believed Chase was in Colorado when he sent the e-mails. M.G. called G.B. in Colorado to warn her of the e-mails, because he feared for her safety, and she then went to the Winter Park police station to open and read the six e-mails from Chase.
¶ 9 Chase was charged with three felony counts of stalking under former section 18-9-111(4)(b)(II) (now codified at section 18-3-602(1)(b), C.R.S.2012 ).[2] At Chase's request, the trial court also instructed the jury on the lesser nonincluded offense of misdemeanor harassment by computer, section 18-9-111(1)(e), C.R.S.2012. After a two-day jury trial, the jury convicted Chase of three counts of felony stalking, one for each of the three named victims. He was also convicted of the three misdemeanor counts of harassment by computer. The court sentenced Chase to the maximum presumptive sentence of four years on each of the felony counts, ordering that the sentences run consecutively, for a cumulative prison sentence of twelve years.
¶ 10 This appeal followed.
II. Sufficiency of Evidence on Jurisdiction
¶ 11 Chase contends that his convictions on counts two and three of felony stalking of M.G. and D.D. must be vacated, because there was insufficient evidence to establish that Colorado had subject matter jurisdiction over those counts given that no part of the offenses against M.G. and D.D. was committed in Colorado.[3] We disagree.
¶ 12 As part of his motion for judgment of acquittal made after the prosecution's case-in-chief, Chase argued that the court did not have jurisdiction over the counts relating to M.G. and D.D. because there was no evidence that "any aspect of this crime occurred in Colorado," given that "neither the participant or the victims were in the state," as required under section 18-1-201, C.R.S.2012.
¶ 13 The trial court denied the motion, reasoning that regardless of whether M.G. and D.D. read the e-mails while they were out of the state, the trial court still had jurisdiction over those counts because it had jurisdiction over the count related to G.B., who had opened and read her e-mails while in Colorado.
¶ 14 We agree with the trial court's conclusion that it had jurisdiction over counts two and three, but we reach that conclusion based on different reasoning from that employed by the trial court.
A. Standard of Review and Applicable Law
¶ 15 Whether the evidence was sufficient to sustain a conviction is a question of law that we review de novo. Dempsey v. People, 117 P.3d 800, 807 (Colo.2005). When reviewing a sufficiency of the evidence contention, a court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. People v. Sprouse, 983 P.2d 771, 777 (Colo.1999) ; People v. McIntier, 134 P.3d 467, 471 (Colo.App.2005). The prosecution must be given the benefit of every reasonable inference that might be fairly drawn from the evidence. McIntier, 134 P.3d at 471.
¶ 16 Here, defendant's sufficiency of the evidence contention turns, in part, on a question of statutory interpretation. Statutory interpretation is a question of law that we review de novo. Romero v. People, 179 P.3d 984, 986 (Colo.2007). When interpreting a statute, we must give effect to the General Assembly's intent, which we determine primarily from the statute's plain language. Id. We read words and phrases in context and construe them according to their common *747 usage. People v. Rice, 198 P.3d 1241, 1244 (Colo.App.2008). If the statutory language is unambiguous, we look no further and apply the words as written. People v. Summers, 208 P.3d 251, 254 (Colo.2009).
¶ 17 In our review, we may affirm a trial court's ruling on grounds different from those employed by that court, as long as they are supported by the record. Moody v. People, 159 P.3d 611, 615 (Colo.2007) ; People v. Aarness, 150 P.3d 1271, 1277 (Colo.2006) ; People v. Holmes, 959 P.2d 406, 408 (Colo.1998).
B. Analysis
¶ 18 Our statutory analysis requires us to interpret section 18-1-201 (relating to state jurisdiction over criminal offenses) and section 18-9-111(4)(b)(II) (the felony stalking offense at issue here), and the interplay between those two statutes.
¶ 19 As pertinent here, section 18-1-201, provides as follows:
(1) A person is subject to prosecution in this state for an offense which he commits, by his own conduct ... if:
(a) The conduct constitutes an offense and is committed either wholly or partly within the state.
Section 18-1-201(2), C.R.S.2012 provides, in pertinent part: "An offense is committed partly within this state if conduct occurs in this state which is an element of an offense or if the result of conduct in this state is such an element."
¶ 20 Section 18-9-111(4)(b)(II) defines the felony stalking offense at issue here as follows:
(b) A person commits stalking if directly, or indirectly through another person, such person knowingly:
(II) Makes a credible threat to another person and, in connection with such threat, repeatedly makes any form of communication with that person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship, regardless of whether a conversation ensues.
(Emphasis added.)
¶ 21 Under former section 18-9-111(4)(c)(II), "credible threat"
means a threat, physical action, or repeated conduct that would cause a reasonable person to be in fear for the person's safety or the safety of his or her immediate family or of someone with whom the person has or has had a continuing relationship. Such threat need not be directly expressed if the totality of the conduct would cause a reasonable person such fear.
(Emphasis added.)
¶ 22 Under the plain language of section 18-9-111(4)(b)(II) and (4)(c)(II), the elemental conduct of making a credible threat is defined by its result of causing a reasonable person to be in fear as described. Thus, those statutes are properly interpreted to state that a person commits the offense of stalking if he or she knowingly engages in conduct that causes a reasonable person to fear for his or her safety, or the safety of his or her family or intimates.
¶ 23 In applying the language of these two statutory provisions to the facts here, the critical question in our analysis is whether there was sufficient evidence to prove that Chase committed at least part of the conduct included as an element of felony stalking in Colorado, as required under sections 18-1-201(1)(a) and (2).
¶ 24 Chase contends that, because he wrote and sent the e-mails in Boston, and because M.G. and D.D. opened the e-mails in Baltimore, none of the conduct occurred in Colorado. However, we conclude that the key analysis on the facts here is not where the e-mails were written or read, but rather whether the result of Chase's conduct, namely, causing a reasonable person to be in fear for his or her safety, occurred, at least in part, in Colorado.
¶ 25 It is a question for the fact finder whether there actually existed a credible threat in Colorado. See People v. Baer, 973 P.2d 1225, 1230 (Colo.1999). At trial, the jury was properly instructed that Chase was charged with committing three counts of *748 stalking in Grand County, Colorado, and that the jury had to determine as an element of the stalking counts that Chase committed the offense "in the State of Colorado."
¶ 26 Based on our review of the record, we conclude that there is sufficient evidence to establish that the threats made by Chase in the e-mails would have caused a reasonable person in the position of M.G. and D.D. to be in fear for their own safety and the safety of other persons in Colorado. Testimony at trial showed that (1) Chase did not know that either M.G. or D.D. was in Baltimore at the time, but he knew that they lived in Colorado; (2) Chase knew where M.G. and D.D. lived in Colorado; (3) M.G. and D.D. knew that they would be returning to Colorado; (4) Chase lived in Colorado; and (5) the conduct Chase demanded from the victims (removing the eviction notice) necessarily had to occur in Colorado. Further, the jury could reasonably infer that Chase would have to be in Colorado to determine whether the eviction notice had been removed, and, thus, his threatened retribution against the victims would occur in Colorado.
¶ 27 M.G. and D.D. both testified at trial that Chase's threats caused them to be in fear for their own safety and for the safety of each other in Colorado, as well as for the safety of other people in Colorado. Thus, M.G. testified that, upon reading the e-mails while he was in Baltimore, he "was alarmed and concerned for the safety of [his] home, which was 1700 miles away, and the safety of some other people who are mentioned in the e-mail," including his mother and D.D.'s mother, who both lived in Colorado. M.G. called G.B. in Colorado, because he feared for her safety, encouraging her to go to the authorities and avoid Wapiti Meadows. He then called his neighbor in Colorado and asked him to "keep an eye out" on his house and automobiles. He also called his house-sitter and warned her to not go to his house alone. D.D. testified that the e-mails were threats to her, and that something could be done to her and M.G.
¶ 28 These circumstances are similar to those in People v. Jacobs, 91 P.3d 438, 442 (Colo.App.2003). There, the defendant sent emails soliciting a child prostitute which were received and read in California. Nonetheless, a division of this court held that Colorado had jurisdiction over the case because the e-mails indicated that the defendant sought to meet with a prostitute in Colorado, identified Colorado as the place where the illegal sex acts would occur, and indicated that he lived in Colorado. Id.; see also People v. Martinez, 37 Colo.App. 71, 73, 543 P.2d 1290, 1292 (1975) (by enacting section 18-1-201, "Colorado has modified the common law rule of limited territorial jurisdiction by enlarging its power to prosecute crimes that may originate outside the state"). Similarly, here, even though the e-mails were read outside Colorado, the credible threat which caused the victims to be in fear for their safety occurred, at least in part, in Colorado.
¶ 29 We also conclude that Chase's conduct of making a credible threat occurred at least partly in Colorado because he sent his email messages to e-mail addresses associated with individuals he knew to reside in Colorado. Although e-mail addresses can be accessed from any locale, as occurred here when M.G. and D.D. accessed their e-mail accounts in Baltimore, Chase used their personal e-mail addresses to communicate with individuals that he knew lived in Colorado. See Kirwan v. State, 351 Ark. 603, 96 S.W.3d 724, 731 (2003) (e-mail addresses of Arkansas residents were considered to be "located in Arkansas"); see also Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911) ("[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power"). Contrary to Chase's argument, the reasoning in Strassheim has been applied broadly to a wide variety of facts in other jurisdictions. See Ford v. United States, 616 A.2d 1245, 1251-52 (D.C.1992) (relying on Strassheim to support jurisdiction over a defendant who committed offenses in Maryland as part of attempt to obstruct justice in the District of Columbia); State v. Meyers, 72 Haw. 591, 825 P.2d 1062, 1064 (1992) (citing Strassheim as support for state court jurisdiction over threatening phone calls originating from outside *749 the state); People v. Aspy, 292 Mich.App. 36, 808 N.W.2d 569, 573 (2011) (relying on Strassheim to hold that Michigan had territorial jurisdiction over conduct committed in another state that was intended to have a detrimental effect within the state); Jaynes v. Commonwealth, 276 Va. 443, 666 S.E.2d 303, 307 (2008) (relying on Strassheim as support for the principle that "a state may exercise jurisdiction over criminal acts that are committed outside the state, but are intended to, and do in fact, produce harm within the state"); Terrence Berg, State Criminal Jurisdiction in Cyberspace: Is There a Sheriff on the Electronic Frontier?, 79 Mich. B.J. 659, 660-61 (2000) (analyzing various state jurisdictional statutes, and noting that Colorado, in section 18-1-201, has codified the bases of its jurisdiction similar to the Strassheim test).
¶ 30 Under these circumstances, we conclude Chase should not be the beneficiary of the coincidence that M.G. and D.D. were physically in Baltimore when they read the e-mails Chase intended for them to receive and act on in Colorado. Rather, the evidence in the record, when considered in the light most favorable to the prosecution, is, in our view, sufficient to establish that Chase committed the offense of felony stalking in Colorado, consistent with section 18-1-201.
¶ 31 Accordingly, we conclude that the trial court did not err when it ruled that Colorado had jurisdiction over the felony stalking counts relating to D.D. and M.G. While we do not adopt the trial court's reasoning, we may affirm its judgment on different grounds when, as here, those grounds are supported by the record. See Moody, 159 P.3d at 615.
III. Trial Court Response to Jury Question
¶ 32 In a related issue, Chase contends that the trial court erred when, upon receiving a question from the jury regarding the part of the elemental instruction on stalking requiring that the offense be committed in Colorado, the court responded by reiterating that it was the prosecution's responsibility to prove all elements of the charged offense. On the facts presented here, we discern no reversible error in the trial court's response to the jury.
¶ 33 The trial court instructed the jury that the elements of the felony stalking offense were:
1. That the defendant;
2. in the State of Colorado , at or about the date and place charged,
3. directly or indirectly through another person
4. knowingly,
5. made a credible threat to another person,
6. and in connection with such threat,
7. repeatedly
8. made any form of communication with that person, regardless of whether a conversation ensued.
(Emphasis added.)
¶ 34 During deliberations, the jury sent a question to the trial court which stated, "[T] he elements of the crime of stalking, threat, repeated communication, does in the State of Colorado mean physically initiating the threat in the State? Re: This is cyber span [sic] communication with no boundaries."
¶ 35 The ensuing colloquy between the court and defense counsel was as follows:
[Defense counsel]: [A]s we noted in our objection and motion for judgment of acquittal, that we believe it does require that. I would direct the Court to 18-1-201 for some possible language to give to the jury....
Or if the Court just wanted to give the instruction of, yes it does. I think either one of those is proper....
[O]ne of the parties, or part of the conduct, needs to be in the State of Colorado.... I don't know how to fashion a proper response to the question, but I think something along those lines. That there needs to be some evidence that people were in this state.
The Court: I do think there may be two separate questions, and I took your motion [for judgment of acquittal] as whether the Court has jurisdiction.... The other question is proof of the elements of the crime.... I think that I have to say in *750 response to this simply that the People must prove all of the elements of the charges and leave it at that, and the jury will decide.... So, my intention at this point ... is to simply respond that I can't respond further other than to say the People must prove each and every element of the offense as charged....
[Defense Counsel]: I think the Defense's request would be that you inform the jury that the offenses do need to occur in the State.
(Emphasis added.)
¶ 36 On appeal, Chase contends that the trial court "at a minimum, should have instructed the jury that the prosecutor had to prove that Mr. Chase's conduct or the result of his conduct had to take place or occur in the State of Colorado." We disagree.
A. Standard of Review and Applicable Law
¶ 37 Whether to provide the jury with additional written instructions in response to a question is a determination within the trial court's sound discretion. People v. Thornton, 251 P.3d 1147, 1152 (Colo.App.2010) (citing People v. Bass, 155 P.3d 547, 552 (Colo.App.2006) ). Absent evidence to the contrary, a jury is presumed to understand and follow the trial court's instructions. Id. (citing Leonardo v. People, 728 P.2d 1252, 1255 (Colo.1986) ). This presumption may be overcome "when the jury indicates to the judge that it does not understand an element of the offense charged or some other matter of law central to the guilt or innocence of the accused." Leonardo, 728 P.2d at 1256.
¶ 38 When additional instruction is needed, it should be provided unless
(1) the jurors can be adequately informed by directing their attention to some portion of the original instructions; (2) the request concerns matters not in evidence or does not pertain to the law of the case; or (3) the request would call upon the judge to express an opinion upon factual matters that the jury should determine.
Copeland v. People , 2 P.3d 1283, 1288 (Colo.2000) ; see also ABA Standards for Criminal Justice 15-5.3 (3d ed.1996). American Bar Association commentary on this standard notes the "sensitive" nature of providing additional instructions because they "may have the effect, intended or not, of coercing a juror into abandoning his or her original position." Thornton , 251 P.3d at 1152 (quoting ABA Standards for Criminal Justice 15-5.3 cmt.).
¶ 39 While it is debatable from the colloquy above whether, at trial, Chase preserved the precise contention he now asserts on appeal, we will assume it was preserved and review the trial court's decision under a harmless error standard. People v. Suazo, 87 P.3d 124, 127 (Colo.App.2003).
B. Analysis
¶ 40 We conclude that the trial court did not commit any reversible error in its response to the jury's question because (1) the question did not reflect that the jury had a fundamental misunderstanding of a legal element of the offense, (2) the original instructions properly stated the applicable law and adequately answered the question, and (3) the trial court essentially responded as defense counsel requested at trial.
¶ 41 In our view, the jury's question did not reflect a fundamental misunderstanding of an element of the offense, but rather the jury's uncertainty how to apply the legal standard to the particular facts of the case. Specifically, the jury asked, "[D]oes in the State of Colorado mean physically initiating the threat in the State? Re: This is cyber span [sic] communication with no boundaries." Chase argues that the jury's question reflects a fundamental legal misunderstanding that "the nature of an e-mail communication had 'no boundaries,' and therefore, its origin, whether within the state or outside of it was of no consequence." We disagree, and conclude that the question merely reflects that the jury was struggling to apply an element of the offense ("in the State of Colorado") to the unique facts of the case involving the transmission of e-mails, which could have been sent from or received anywhere, to recipients who were known to live in Colorado and from a perpetrator who was basing his threats upon his knowledge of the *751 recipients' location and activities in Colorado.
¶ 42 The jury's question here is directly analogous to jury questions considered in Bass, where the jury also sought clarification of an element of the offense, asking, "Does failure to stop an ongoing assault constitute knowledge of the intent to commit an assault? ... [D]oes leaving the scene of a crime constitute facilitating the commission of the crime?" Bass, 155 P.3d at 552. In Bass, a division of this court held that the jury's questions did not show a fundamental misunderstanding of the law, but involved "determinations that require application of the facts of the case" to an instruction, and on which the trial court must not express an opinion. Id. at 553 ; see also People v. Mascarenas, 972 P.2d 717, 723-24 (Colo.App.1998) (trial court properly referred the jury back to original instructions rather than providing additional information regarding the definition of "knowing dominion" because further comment would have "amounted to an expression of opinion by the court on a matter that was properly determinable by the jury").
¶ 43 Accordingly, because the jury asked a question about how to apply the facts to an element of the offense, it was not an abuse of discretion for the trial court to simply reiterate the original instructions on the prosecution's burden of proof as to all elements of the charged offense.
¶ 44 Further, the trial court's response to the jury's question was proper because the original instructions reflected the applicable law and adequately answered the question. The original instructions properly informed the jury that the offense must have occurred "in the State of Colorado " (emphasis added). The instructions also properly articulated the prosecution's burden of proof with respect to this and all other elements of the offense. Thus, as we have already concluded, it was not an abuse of discretion for the trial court to reiterate the original instructions. See Sanchez v. People, 820 P.2d 1103, 1107 (Colo.1991) ("[w]hen the answer to a jury's question is contained in the initial jury instructions, a trial court does not err by directing the jury's attention to those instructions"); Thornton, 251 P.3d at 1152 (trial court correctly referred jury to instruction on the prosecution's burden of proof when instruction contained applicable law and the question did not reflect a fundamental misunderstanding); People v. Dunlap , 124 P.3d 780, 818 (Colo.App.2004) (no error when trial court referred jury back to original instructions in response to a question when original instructions properly placed the burden of proof on the People and adequately defined the questioned term); People v. Kittrell , 786 P.2d 467, 470 (Colo.App.1989) (appropriate to refer the jury back to instructions when they adequately define the elements of the offense which are the subject of the jury's inquiry).
¶ 45 Contrary to Chase's contention on appeal, the trial court essentially responded to the jury as Chase requested at trial. To the extent that Chase was asking the trial court to "inform the jury that the offenses do need to occur in the State," as he stated in his final request to the trial court, the jury instructions on the elements of the offense already did that. The trial court's response to the jury simply reiterated that the prosecution had to prove beyond a reasonable doubt that the offense was committed in Colorado.
¶ 46 To the extent that Chase was asking the trial court to instruct the jury that "there needs to be some evidence that people were in this State" at the time the conduct was initiated, that is not the law under section 18-1-201(1)(a). See Martinez, 37 Colo.App. at 73, 543 P.2d at 1292. To the extent that Chase wanted the jury to be instructed on the precise language in section 18-1-201(1)(a) and (2), while such an instruction may have been within the court's discretion, under the circumstances here, it was not an abuse of discretion for the trial court to decline to do so given that the original instructions were an accurate statement of the law. In any event, we conclude that there was no prejudice to Chase because, as discussed above, there was more than sufficient evidence to allow the jury to reasonably find that the stalking conduct of making a credible threat occurred, at least partly, in Colorado.
*752 ¶ 47 Accordingly, we perceive no abuse of discretion in the trial court's response to the jury's question.
IV. Sufficiency of Evidence on Other Elements of Stalking
¶ 48 Chase also contends that the evidence was insufficient (1) to prove that he made a credible threat, as defined in 18-9-111(4) (c)(II); and (2) to prove that he made repeated communications in connection with the threat, as required under 18-9-111(4)(b)(II). We disagree.
A. Standard of Review and Applicable Law
¶ 49 When the sufficiency of the evidence is challenged on appeal, the reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. Sprouse, 983 P.2d at 777 ; Suazo, 87 P.3d at 126.
¶ 50 If there is evidence upon which one may reasonably infer an element of the crime, the evidence is sufficient to sustain that element. People v. Thompson, 121 P.3d 273, 278 (Colo.App.2005). The determination of the credibility of the witnesses is solely within the province of the fact finder, and it is the fact finder's function in a criminal case to consider and determine what weight should be given to all parts of the evidence and to resolve conflicts, testimonial inconsistencies, and disputes in the evidence. McIntier, 134 P.3d at 471.
¶ 51 Pursuant to section 18-9-111(4)(b)(II), as pertinent here, a person commits stalking if he or she knowingly makes a credible threat to another person and, in connection with that threat, repeatedly makes any form of communication with that person. A credible threat is
a threat, physical action, or repeated conduct that would cause a reasonable person to be in fear for the person's safety or the safety of his or her immediate family or of someone with whom the person has or has had a continuing relationship. Such threat need not be directly expressed if the totality of the conduct would cause a reasonable person such fear.
§ 18-9-111(4)(c)(II). Conduct "in connection with" a credible threat means "acts which further, advance, promote, or have a continuity of purpose, and may occur before, during, or after the credible threat." People v. Carey, 198 P.3d 1223, 1232 (Colo.App.2008) (quoting § 18-9-111(4)(c)(I) ); see also Suazo, 87 P.3d at 126-27. "Repeated" or "repeatedly" means "on more than one occasion." § 18-9-111(4)(c)(IV). Consequently, "per victim, stalking can occur only when there is conduct comprising two or more occurrences of the specified acts." People v. Herron, 251 P.3d 1190, 1194 (Colo.App.2010).
B. Analysis
¶ 52 We first reject Chase's contention that the evidence was insufficient to prove that he made a credible threat.
¶ 53 On review, we must consider whether Chase's conduct constituted a threat that would "cause a reasonable person to fear" for his or her safety. Chase's first e-mail refers to his past conviction for arson and then states, "Do NOT FUCK WITH ME.... YOU BETTER PUT ME AWAY FOR LIFE MOTHERFUCKERS OR THERE WILL BE HELL TO PAY." Subsequent e-mails state that "SOMEONE IS GOING TO GET HURT OR WORSE," that Chase has "NOTHING TO LOSE," and that he will "headbutt" and "kick" someone. Two of the e-mails make specific references to the named victims. G.B. testified that, based on the e-mails, she feared for her and her family's safety, and as a precaution she did not go to work for three days and pulled her child out of school. M.G. testified that he feared for his and his family's safety (including his wife, D.D.) to the point that he bought a gun when he returned to Colorado. He also testified that he feared for G.B.'s safety. D.D. testified that she felt "threatened" by Chase's e-mails and "took it personally" that the violent language in the e-mails indicated something could happen to her, her husband (M.G.)., and the other recipients of the e-mails.
*753 ¶ 54 We conclude that the evidence was more than sufficient for the jury to find that Chase's e-mails, with their implicit and explicit threats, would cause a reasonable person to be in fear for his or her safety, or the safety of other persons, as set forth in section 18-9-111(4)(b)(II), and thus, constitute a credible threat.
¶ 55 We also reject Chase's contention that he did not make repeated communications in connection with a credible threat because the three named victims opened and read all the e-mails in one sitting. The e-mails represent six separate and individual communications to the victims made over a period of two days. Under the plain language of the statute, once a credible threat was established (as the jury could have concluded regarding Chase's first e-mail), there was sufficient evidence of at least two additional communications that could have caused the victims to be in fear for their safety. See § 18-9-111(4)(c)(IV) (defining the terms "repeated" or "repeatedly"). We agree with the People that nothing in the statute indicates that Chase should be relieved of criminal liability simply because the three named victims did not retrieve each of the e-mails the moment they were delivered. Further, there is no additional statutory requirement that the repeated communications must occur over a specific time period. Indeed, under section 18-9-111(4)(c)(I), conduct in connection with "a credible threat may occur before, during, or after the credible threat itself." Accordingly, we conclude that six communications in two days constitute repeated communications in connection with the credible threat, regardless of whether the victims became aware of the communications as they occurred, or in one sitting. See Herron, 251 P.3d at 1194 (contact was considered a separate incident even though defendant observed the victim without her noticing, and then informed her of the contact at a later time); Carey, 198 P.3d 1223 (three contacts over five days constituted repeated conduct).
¶ 56 We also conclude that the repeated communications in Chase's e-mails were clearly "in connection with" the credible threat because they were acts that furthered, promoted, or had a "continuity of purpose." See Carey, 198 P.3d at 1232. Four of the e-mails referred specifically to Chase's demand that the eviction notice be removed, two of the e-mails referred to the victims by name, and all six e-mails referred to a specific or implicit intended retaliation. Based on these repeated statements, the e-mails more than adequately reflect a continuity of purpose. See People v. Cross , 114 P.3d 1, 5 (Colo.App.2004) (credible threat existed even though perpetrator never said anything to the victim and merely observed her), rev'd on other grounds , 127 P.3d 71 (Colo.2006).
¶ 57 In sum, we conclude the evidence was sufficient for the jury to find beyond a reasonable doubt that Chase committed the offense of felony stalking, as set forth in section 18-9-111(4)(b).
V. Mens Rea Instruction
¶ 58 Defendant also contends that the trial court incorrectly instructed the jury on the mens rea of the felony stalking offense. We disagree.
¶ 59 Chase made no contemporaneous objection to the jury instruction on the elements of stalking. Therefore, we review his contention for plain error. Jacobs, 91 P.3d at 441. Plain error addresses error that is both obvious and substantial. People v. Miller, 113 P.3d 743, 750 (Colo.2005). Plain error occurs only when the error so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. Id. As applied to jury instructions, a defendant must demonstrate not only that the instructions affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to the conviction. Id.
¶ 60 "When a statute defining an offense prescribes as an element thereof a specified culpable mental state, that mental state is deemed to apply to every element of the offense...." Copeland, 2 P.3d at 1286 (quoting § 18-1-503(4), C.R.S.2012 ). A jury instruction that tracks such language of the statute is almost always sufficient. Jacobs, 91 P.3d at 441.
¶ 61 The jury instructions at trial provided that the elements of the offense were
*754 1. That the defendant;
2. in the State of Colorado, at or about the date and place charged,
3. directly or indirectly through another person
4. knowingly ,
5. made a credible threat to another person,
6. and in connection with such threat,
7. repeatedly
8. made any form of communication with that person, regardless of whether a conversation ensued.
(Emphasis added.) This instruction tracks the language of section 18-9-111(4)(b)(II).
¶ 62 The instruction listed the knowingly mens rea as a standalone element, thereby indicating that it applied to all of the subsequent elements of the offense. See People v. Bossert, 722 P.2d 998, 1011 (Colo.1986) (where the mens rea term "knowingly" is offset from and precedes the conduct element, it properly modifies all conduct described in the elemental instruction); Dunlap, 124 P.3d at 811 ("[t]he term 'knowingly,' when offset from other elements, modifies all succeeding conduct elements"); cf. Suazo, 87 P.3d at 127-28 (jury instructions held improper because the mens rea of knowingly was not listed as a stand-alone element).
¶ 63 Accordingly, we perceive no error, let alone plain error, in the jury instruction on the mens rea element of the offense of felony stalking.
VI. As-Applied Constitutional Challenges
¶ 64 Chase contends that section 18-9-111(4)(b)(II) is unconstitutional as applied to him because it violates both his First Amendment and Equal Protection Clause rights. We disagree.
¶ 65 We review the constitutionality of a statute as applied de novo. Hinojos-Mendoza v. People, 169 P.3d 662, 668 (Colo.2007) ; People v. Stanley, 170 P.3d 782, 787 (Colo.App.2007). A statute is presumed to be constitutional, and the party challenging the statute has the burden of proving unconstitutionality beyond a reasonable doubt. People v. Janousek, 871 P.2d 1189, 1195 (Colo.1994) (Mullarkey, J., specially concurring).
A. First Amendment Challenge
¶ 66 Chase argues that section 18-9-111(4)(b)(II) is unconstitutional as applied to him because his e-mail communications did not constitute "true threats," but were instead protected speech under the First Amendment. We disagree.
¶ 67 Chase preserved this argument by making it in his motion for judgment of acquittal. The trial court rejected his argument, and we discern no error in the trial court's ruling.
¶ 68 While the First Amendment protects the right to free speech, its protection is not absolute. Stanley, 170 P.3d at 786 (citing Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ). Some categories of speech, such as "true threats," are unprotected by the First Amendment and, thus, may be regulated by the government. Id. (citing Black, 538 U.S. at 358-59, 123 S.Ct. 1536 ); see Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).
¶ 69 A threat is a statement of purpose or intent to cause injury or harm to the person, property, or rights of another, by the commission of an unlawful act. McIntier, 134 P.3d at 472 (citing People v. Hickman , 988 P.2d 628, 637 (Colo.1999) ). The critical inquiry here is "whether the statements, viewed in the context in which they were spoken or written, constitute a 'true threat.' " Id . (quoting Janousek , 871 P.2d at 1198 ). A true threat is not merely talk or jest, and is evaluated "by whether those who hear or read the threat reasonably consider that an actual threat has been made." Id . (quoting Janousek , 871 P.2d at 1198 ).
¶ 70 While whether a statement is a true threat is a question of fact to be determined by the fact finder, id. at 474, where First Amendment concerns are implicated, the court has an obligation to make an independent review of the record to assure that the judgment does not impermissibly intrude on the field of free expression.
*755 Stanley, 170 P.3d at 790. In this determination, we first consider the plain import of the words used. Id. (citing Janousek, 871 P.2d at 1195 ). We must also consider the context in which the statements were made. Id. (citing McIntier, 134 P.3d at 472 ). Some of the contextual factors that may be considered include (1) to whom the statement is communicated; (2) the manner in which the statement is communicated; and (3) the subjective reaction of the person whom the statement concerns. Id. (citing Watts, 394 U.S. at 708, 89 S.Ct. 1399 ).
¶ 71 At trial, and as requested by Chase, the jury was instructed to consider whether Chase's e-mails constituted true threats, and Chase's counsel urged the jury to acquit Chase on the basis that his e-mails were not true threats and were, thus, entitled to First Amendment protections.
¶ 72 In that regard, the jury was instructed as follows:
While the First Amendment to the United States Constitution, and provisions of the Colorado Constitution, protect the right of free speech, its protection is not absolute. Freedom of speech does not protect a statement that a reasonable speaker and a reasonable recipient would perceive as a threat of harm, and this is so even though the speaker may not have intended the recipient to perceive a threat. True threats, however communicated, are not protected by the First Amendment. To determine whether a statement or statements are "true threats" you may consider: the plain import of the words and the context in which they are made. The context may include consideration of: (1) to whom the statement is communicated, and (2) the manner in which the statement is communicated, and (3) the subjective reaction of the person whom the statement concerns.
A true threat must be ... unequivocal, unconditional, immediate and specific as to the person threatened.
True threats contain a gravity of purpose and likelihood of execution and go beyond protected, vehement, caustic or unpleasant sharp words. You may however also consider the forceful language of the statement and explicit and implicit threat(s) expressed thereby.
¶ 73 The jury decided, as a matter of fact, that the e-mails constituted true threats and convicted Chase of felony stalking. Based on our independent review of the record, we conclude that Chase's communications constituted true threats, and were "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Stanley, 170 P.3d at 786 (quoting Black, 538 U.S. at 359, 123 S.Ct. 1536 ). Besides the overall forceful and violent language and imagery used in the emails, Chase referred to his prior conviction for arson and stated specifically, "Do NOT FUCK WITH ME.... YOU BETTER PUT ME AWAY FOR LIFE MOTHERFUCKERS, OR THERE WILL BE HELL TO PAY," as well as, "I will headbutt someone, and I can and will kick." See Janousek, 871 P.2d at 1193, 1195 (noting the forceful language of the statement and the explicit and implicit threat expressed thereby); see also Baer, 973 P.2d at 1232 (credible threats are not protected by the First Amendment). Chase also expressly referred to the named victims in two of the e-mails. At trial, three named victims testified that they felt very threatened and frightened by the language in the e-mails, and M.G. and G.B. both noted specific precautionary measures that they took to protect themselves. See Stanley, 170 P.3d at 790 (one factor considered in identifying a true threat is the subjective reaction of the recipient).
¶ 74 Contrary to Chase's argument that the e-mails cannot constitute true threats because most of them were not directed at a particular individual, a true threat can be directed to a group of individuals. Id. at 786. Further, all of the e-mails were sent by Chase to the named victims, and he knew them personally, as well as where they lived. See id. (a factor to be considered in identifying a true threat is to whom the statement is communicated).
¶ 75 Considering the plain language of the statements Chase made in the e-mails and the context in which those statements were made, we conclude that the e-mails constituted true threats and that, accordingly, application *756 of section 18-9-111(4)(b)(II) to Chase's conduct did not violate his First Amendment rights.
B. Equal Protection Challenge
¶ 76 For the first time on appeal, Chase contends that convicting him of felony stalking under section 18-9-111(4)(b)(II) violates his constitutional right to equal protection under the law. We disagree.
¶ 77 Initially, we reject the People's argument that we should decline to consider Chase's as-applied equal protection challenge because he did not raise this argument in the trial court. See People v. DeWitt, 275 P.3d 728, 730 (Colo.App.2011) ; see also People v. Greer, 262 P.3d 920, 933 (Colo.App.2011) (J. Jones, J., specially concurring). Rather, we exercise our discretion to review Chase's as-applied equal protection challenge to section 18-9-111(4)(b)(II) for plain error, because a review at this time will promote efficiency and judicial economy and because Chase's challenge can be decided as a pure question of law and does not require further factual development. See DeWitt, 275 P.3d at 730 ; People v. Devorss, 277 P.3d 829, 834 (Colo.App.2011).
¶ 78 In support of his equal protection claim, Chase repeats his contention that his conduct did not constitute repeated communications made in connection with a credible threat, as required for a felony conviction under section 18-9-111(4)(b)(II). Rather, he asserts his conduct fell only within the ambit of the misdemeanor harassment statute which requires, as relevant here, and as the jury was instructed, that the defendant, with intent to harass, annoy, or alarm another person, initiate communication in a manner intended to harass or threaten bodily injury or property damage, with a person anonymously or otherwise, by computer, computer network, or computer system, § 18-9-111(1)(e). Chase argues that convicting him as a felon for conduct that falls under the misdemeanor harassment statute violates his equal protection rights. We disagree.
¶ 79 Different statutes proscribing the same criminal conduct with disparate criminal sanctions violate equal protection principles. See Bossert, 722 P.2d at 1003 ; see also People v. Stewart, 55 P.3d 107, 114 (Colo.2002).
¶ 80 The two statutes at issue here, however, proscribe different, albeit related, criminal conduct. See Bossert, 722 P.2d at 1003. Comparing the language of section 18-9-111(4)(b)(II) and section 18-9-111(1)(e), it is clear that, as a matter of law, the two statutes do not set forth disparate sanctions for the same conduct. The felony stalking statute ( section 18-9-111(4)(b)(II) ) requires repeated communications in connection with a credible threat, whereas the misdemeanor statute ( section 18-9-111(1)(e) ) requires only one communication by use of a computer in a manner intended to harass or threaten bodily injury or property damage. While the conduct is related, it is not identical.
¶ 81 Accordingly, the two statutes do not proscribe the same conduct with disparate sanctions, and we perceive no error, let alone plain error, constituting any violation of Chase's equal protection rights. See id. (the fact that particular conduct may violate two different statutes is no basis for the conclusion that one of them violates equal protection guarantees).
VII. Sentencing
¶ 82 Finally, Chase contends that the trial court abused its discretion when it imposed a consecutive maximum four-year sentence for his conviction on each of the three felony stalking counts, because the court did not consider mitigating sentencing factors, including his mental health issues and, instead, focused on the effect his conduct had on the three named victims. We disagree.
¶ 83 A trial court has broad discretion when imposing a sentence, and the sentence imposed will not be overturned in the absence of a clear abuse of discretion. People v. Fuller, 791 P.2d 702, 708 (Colo.1990). A trial court may impose consecutive sentences for offenses supported by identical evidence but involving multiple victims. People v. McAfee, 104 P.3d 226, 231-32 (Colo.App.2004) (citing § 18-1-408(3), C.R.S.2012 ).
*757 ¶ 84 In exercising its sentencing discretion, a trial court must consider the nature and elements of the offense, the character and rehabilitative potential of the offender, any aggravating or mitigating circumstances, and the public interest in safety and deterrence. People v. Eurioste, 12 P.3d 847, 850 (Colo.App.2000). "The court may not place undue emphasis on any one of these factors to the exclusion of the others." Id. However, a court need not explicitly refer to each of the factors it considered. People v. Koehler, 30 P.3d 694, 698 (Colo.App.2000). Additionally, the trial court need only state on the record the basic reasons for imposing the sentence. People v. Howell, 64 P.3d 894, 898 (Colo.App.2002).
¶ 85 In imposing Chase's consecutive sentences, the court expressly noted that it considered the testimony at trial and the jury's verdicts; that it reviewed the presentence report and documents filed by Chase prior to the sentencing hearing; and that it also considered Chase's prior criminal history and his mental health issues. The trial court also stated that it was "very impressed by the depth of the effect of [Chase's] conduct on the witnesses." It noted "[w]ith regard to the mental health issues," that there was "no evidence during the trial or [the sentencing] hearing or from counsel that [Chase] is not legally competent to participate in these proceedings." The court also expressly found that the impact of Chase's conduct on the victims and their families "was great and unnecessary and cannot be justified by either emotion or mental health issues." Finally, the trial court noted that Chase still had not taken responsibility for his actions.
¶ 86 Thus, contrary to Chase's contention on appeal, the trial court considered a wide range of factors when sentencing him. Given the seriousness of the impact on the victims, the explicit threats in the e-mails, and the lack of remorse expressed by Chase, we perceive no abuse of discretion, and will not disturb the sentences imposed. See McAfee, 104 P.3d at 232 (no abuse of discretion in sentencing considering the seriousness of injuries and defendant's lack of remorse); Eurioste, 12 P.3d at 850 (in sentencing, trial court must consider the public interest in safety); Koehler, 30 P.3d at 698 (because the sentence was based on appropriate reasons which are supported by the record, it will not be disturbed on review).
¶ 87 The judgment and sentences are affirmed.
JUDGE GABRIEL and JUDGE DUNN concur.

Chase was later acquitted of the charge of criminal mischief, and the restraining order was introduced at the trial in this case for the limited purpose of providing a context for the charges against Chase here.

In 2010, the stalking statute, former section 18-9-111(4), was repealed and reenacted as section 18-3-602, C.R.S.2012, with changes not relevant here. While the offense is now codified at section 18-3-602(1)(b), on appeal both parties refer to the former codification at section 18-9-111(4)(b)(II), and we do the same.

Chase does not challenge the court's jurisdiction over count one, the felony count relating to G.B., presumably because G.B. was physically in Colorado when she read the e-mails.